ROYAL CROWN COLA COMPANY and Consolidated Underwriters, a corporation, Petitioners,

v.

Paul Worthington HINESLY, and the State Industrial Court, Respondents.

No. 40905.

Supreme Court of Oklahoma.

June 22, 1965.

Rogers, Donovan & Rogers, by Gerard K. Donovan, Tulsa, for petitioners.

Harvey C. Carpenter, Tulsa, Charles R. Nesbitt, Atty. Gen., Oklahoma City, for respondents.

WILLIAMS, Justice.

The primary question to be determined is whether Royal Crown Cola Company, employer, authorized Dr. B to treat Paul Worthington Hinesly, claimant.

Claimant was employed by employer as a route salesman. On or about July 11, 1963, as claimant was loading his truck preparatory to going on his route from Tulsa, Oklahoma, he stepped on a broken pop bottle, cutting his right foot through his shoe and penetrating into the sole of the foot approximately three-fourths of an inch.

Claimant testified that at the time of the accident he reported it to J. B. Sellers, vice president in charge of sales for the employer; that he was given first aid in that "they cleaned the cut out with alcohol as best they could and put merthiolate on it

and bandaged it;" that Sellers asked claimant if he wanted to take off or go ahead and work and that claimant chose to "go on and work" if employer would provide him some help so that he could stay "off my foot as much as possible;" that a Charles Graham did then help claimant; that claimant did not go to a doctor that day and worked until July 18, 1963, when his foot became swollen and he was sick and running a high fever; on that date at employer's plant in Tulsa at approximately 7:00 o'clock A.M., he showed Sellers and Graham his foot and told them he was sick. Claimant testified that Graham said "it looked like it was a bad infection and blood poisoning in the foot" and that he had better see a doctor; that claimant then asked Sellers if he could take the day off and see a doctor but that Sellers told him he could not take the day off, that there was no one else to run the route and that the route needed to be serviced, but that Sellers suggested claimant go to the Glass-Nelson Clinic right away; that due to the delay he would be caused by going to the Glass-Nelson Clinic, claimant suggested to Sellers "that he let me go ahead on my route before I saw a doctor;" that Sellers agreed to this and said "Go ahead and see a doctor over there on your route, and have them send R. C. Cola the bill." Claimant further testified that he then went on his route and when he got to Sapulpa, the manager of a food store referred claimant to a Dr. B; that Dr. B examined him and put him in the hospital for three days; that he did not go back to work until July 26th; that he was treated by Dr. B until August 3 when he was readmitted to the hospital and confined there until August 15, 1963; that on August 2nd, the day before readmittance to the hospital he again discussed the matter with Sellers; that he advised Sellers that he was going to have to be readmitted to the hospital for further treatment and that Sellers told him to "go ahead;" that the last treatment he had received from Dr. B was on September 6, 1963. Claimant stated that he had made a number of trips from his home in Tulsa to Sapulpa for treatment other than when hospitalized and that he had spent $37.00 for medicine that had been prescribed for him.

On cross-examination, claimant testified that on the date of the accident Sellers did not tell him to go to the Glass-Nelson Clinic, that he did not know who the company doctor was and that he had never seen any signs posted in the office of employer as to where he should go for treatment if injured. He testified also that when Dr. B released him after the first three days of hospitalization that Dr. B gave him a "slip" and that he gave the slip to Graham; that he did not request that Dr. B's bill be paid when he gave the slip to Graham because he assumed "it was taken care of;" that the insurance company sent him to Dr. W for examination; that he gave the first hospital and doctor bills to the insurance company but that the insurance company did not pay them but that "the man" from the insurance company said "he would pay me, they would write me a check. He never did give me anything;" that this conversation transpired after the claimant's second stay in the hospital.

Charles E. Graham testified that he was the sales supervisor for employer; that he was not present at the exact time claimant injured his foot, but that on July 18, 1963, claimant exhibited his injured foot to witness and Sellers. "He showed us that red streak there up his leg, and we suggested he go see a doctor"; that Sellers suggested that claimant go to the Glass-Nelson Clinic but that claimant "said he would lose too much time waiting until the Glass-Nelson opened or something, and he would rather go ahead over to Sapulpa and make some of his stops, because he couldn't afford to miss the work, make some stops and maybe see a doctor over there."

"Q: What was Mr. Sellers reaction to that?

"A: I believe he said, 'If that's the way you want it, want to go to see a doctor over there, go ahead and do that.

"Q: Did you later, after that conversation in the presence of Mr.

Sellers, also have a conversation in which you and Paul, only, were involved?

"A: Yes, sir, I believe we did.

"Q: What was the nature of that conversation?

"A: About the same thing. I told him if he wanted to do that to go ahead and see a doctor over at Sapulpa, * * *."

Witness testified further that on that same day, July 18, 1963, he visited claimant in the hospital at Sapulpa.

J. B. Sellers testified that he was the sales manager of employer; that on July 11, 1963, claimant came to him with his foot cut; that he administered first aid to claimant's foot; that he did not "definitely" tell claimant at that time to go to the Glass-Nelson Clinic, that he did tell claimant the foot "might ought to be looked at" but to his knowledge claimant did not go to a doctor at that time; that "then one morning" claimant came to the plant with "his foot bothering him quite a bit;" that he told claimant "he really needed to go to a doctor" and that he told claimant to go to the Glass-Nelson Clinic but added "they don't open 'till later;" that since claimant was there early, that he told him to go "over there and wait for them to open;" that the next thing he knew claimant was in the hospital at Sapulpa; that he didn't advise him to go there.

On cross-examination the witness testified as follows:

"Q: Did he ask you to lay off that day, first?

"A: No, I don't think so, because he wanted to work.

"Q: All right, sir. He said he would go ahead and see the doctor?

"A: Thats my understanding.

"Q: Did he make any objection to you about the delay in the time in running his route that morning, Mr. Sellers, because of that delay at Glass-Nelson Clinic?

"A: Might have been something there, too.

"Q: Did he ask you if it would be all right if he saw a doctor on his route?

"A: I don't recall that."

Dr. B testified by deposition for claimant. He stated that he examined claimant on July 18, 1963, and hospitalized and treated him through July 21st, and re-hospitalized claimant on August 3rd through August 15th; that he treated him on August 19, 24, 27 and 30 and September 3, and on October 9, 1963, examined him in preparation for trial; that on first examination claimant had a condition of cellulitis, a swelling of the right foot and lower leg, exquisite tenderness and swelling of the bottom surface of the foot and red streaking up the leg "meaning involvement of the lymph channels, tenderness and swelling of the right upper thigh, with marked enlargement of the lymph glands of the right upper thigh, or inguinal region;" that he administered massive doses of antibiotics, physiotherapy and constant soaking; that he released him to return to work; that on August 3rd, he readmitted claimant and continued the same medication and treatment, "only intensified;" that the intense pain and swelling was reduced but "he never did get free from discomfort;" that he released claimant from the hospital on August 15th, but not to go back to work and on September 9th, he released claimant to return to work with a sponge in his shoe to take the weight off the foot; that in his opinion claimant sustained a permanent partial disability to the body as a whole of ten per cent due to the injury to his foot.

On cross-examination, Dr. B stated the permanent disability to the body was because on his last examination on October 9, 1963, claimant "still has tender scar on the plantar surface of the right foot, but more important, he still has weakness of the right thigh, fairly marked tenderness and swelling of the lymph gland of the right upper thigh in the right inguinal region." And "That the infection of the

lymph glands of his thigh resulted from a spread from the foot will be there indefinitely."

Dr. W testified for respondents below, petitioners here, by written report. He stated he examined claimant on August 29, 1963; that on examination of the right foot, he found a small completely healed scar on the sole of the foot, there was no tenderness and the scar was freely movable; that examination of the right groin revealed "small hard lymph glands;" that "following a lymphadentitis, it is expected that the lymph glands will remain hardened and slightly enlarged for a long time after recovery;" that in his opinion claimant had no disability as a result of the injury.

The trial judge of the State Industrial Court entered an order finding, among other things, that claimant had sustained a compensable injury to his right foot, that claimant was temporarily and totally disabled from July 18, 1963 to July 27, 1963, and from August 3, 1963, to September 9, 1963, that as a result of the injury, claimant had sustained 7 per cent permanent partial disability to the body as a whole, that respondent, Royal Crown Cola Company, had "expressly or impliedly authorized all reasonable and necessary medical treatment rendered claimant" by Dr. B and B's hospital, and, in addition, ordered that petitioners pay claimant his outlay of $37.00 for prescribed medicines and his traveling expenses from his home in Tulsa to Sapulpa for treatment at the hands of Dr. B.

The order was modified on appeal to the court en banc as to the amount of temporary total disability due claimant, and as modified, affirmed.

Employer and its insurance carrier, Consolidated Underwriters, bring this original proceeding for a review of the above order and for vacation of the same advance the following four propositions:

1. Absent an emergency, respondent and insurance carrier are not responsible for medical expenses incurred by employee where employee fails to request treatment be furnished.

2. Where an employer tenders medical treatment to a claimant, but the claimant voluntarily seeks medical services elsewhere, the employer is not liable for such medical attention that claimant elected to seek.

3. A compensation claimant in the matter of returning himself to perfect health is required to act reasonably.

4. Since 85 O.S.1961 § 14 requires employer to furnish medical treatment for injured employee, and makes employer liable for any aggravation incurred through neglect, or carelessness of physician, then the employee, who refused proffered medical treatment and selects his own physician, must accept the risk of carelessness, neglect or complication that follows the treatment given by his chosen physician.

Petitioners' first and second propositions, because of the evidence and their similarity pertaining thereto, will be considered together.

The right to select a physician to treat an injured employee is one available to the employer. However, where the employer reasonably implies that claimant may select his own physician, or in cases of an emergency, the employer may be liable, if the medical treatment is necessary and the charges therefor are reasonable. Sapulpa Tank Company v. Cole, Okl., 386 P.2d 988. In that case we said:

"* * * In Scruggs Bros & Bill Garage v. State Industrial Commission, 94 Okl. 187, 221 P. 470, it was held that, although the employer has the right to furnish medical treatment and designate the physician to furnish the same, where the employer reasonably implies that claimant may select the physician the employer is liable if the charges are reasonable."

We also held in the case of McAlester v. Tooman, Okl., 338 P.2d 1083, that the fact the injured workman had not requested medical treatment would not exonerate employer from liability for work-

man's medical bills, where employer knew of necessity for treatment.

In the case at bar, claimant testified that on July 18, 1963, when his foot became so infected he had to see a doctor, Sellers, the Vice-President of employer, told him to see one on his route and send the bill to "R. C. Cola." This testimony was substantiated by the testimony of Charles E. Graham, sales supervisor for employer, and claimant's immediate boss. Graham also testified that he visited claimant in the hospital in Sapulpa on July 18, 1963, the first day claimant was hospitalized. Claimant testified and such was uncontradicted that he gave a "slip" to his supervisor Graham after his release from the hospital the first time, that he gave the first hospital and doctor bills to the insurance company, and that he advised Sellers on the day before the second admittance to the hospital that he had to return there for treatment.

■ The decision of the State Industrial Court is conclusive as to all non-jurisdictional questions of fact, and where there is any competent evidence reasonably tending to support the same, the order of the State Industrial Court will not be disturbed on review by this Court. Hays v. National Zinc Company, Okl., 395 P.2d 580; Barnard v. Public Service Company, Okl., 394 P.2d 534; Douglas v. Okmar Oil Company, Okl., 383 P.2d 681; General Accident Fire & Life Assurance Corp., v. Mowry, Okl., 262 P.2d 421.

■ We think under the evidence in this case that not only did the claimant have a right to infer that employer would pay his medical expenses, but that he did request medical treatment and that claimant was authorized by the employer to select his own doctor. That authorization was further manifested by the employer when it knew of the treatment by Dr. B and his hospital by the visit of Graham to see claimant in the hospital at the time of the initial hospitalization.

There has been no evidence that the charges by Dr. B and the hospital were not reasonable. There is ample evidence to show that the employer knew the necessity for treatment.

■ Petitioners' third and fourth propositions are without merit. There is no evidence to show that claimant did not do everything that any other ordinarily prudent workman would have done under the same circumstances. The day he cut his foot, first aid was administered, the wound didn't appear too severe, and he wanted to continue to work, stated he could do so with some help, received that help, and in fact worked for a week without too much apparent difficulty. He did not fail, neglect or refuse to submit himself to treatment when his foot became so infected he had to do something. Even at that time, the undisputed evidence shows employer did not want him to take the day off to go see a doctor. From that day forward, claimant did everything in his power to receive treatment and cooperate with the doctor.

We find no evidence that Dr. B was careless nor neglectful in his treatment of claimant or that any complication to claimant arose because of the treatment by Dr. B.

■ Where it appears from competent evidence that expenses for medical attention are properly allowed, the award will not be vacated because there is not shown a specific demand for such medical attention and the refusal to give the same. Pine Valley Lumber Co. v. Watson, 184 Okl. 498, 88 P.2d 610.

The finding of the Industrial Court that claimant as a result of his injury sustained 7 per cent permanent partial disability to his body as a whole is not challenged by petitioners.

The order in all respects is proper and supported by competent evidence. The award is sustained.

HALLEY, C. J., JACKSON, V. C. J., and DAVISON, BLACKBIRD, IRWIN, BERRY and HODGES, JJ., concur.